UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREG EUGENE SPARROW,

    *Plaintiff*,

v.

COMMISSIONER OF SOCIAL SECURITY,

    *Defendant*.
_____/

CASE NO. 15-CV-11397

DISTRICT JUDGE PAUL D. BORMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 11, 12)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. 11) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 12) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 12).

Plaintiff Greg Eugene Sparrow was forty-six years old when she applied for benefits on April 27, 2012. (Doc. 9, Tr. at 121.). The application was denied on July 25, 2012, and the Commissioner had considered osteoarthritis and allied disorders as the possible bases for disability. (Tr. at 59.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Mary Ann Poulose on July 1, 2013. (Tr. at 28-49.) On August 26, 2013, the ALJ issued a written decision in which he found Regan not disabled. (Tr. at 13-28.) On February 20, 2015, the Appeals Council denied review. (Tr. at 1-7.) Plaintiff filed the instant complaint for judicial review of that final decision on April 16, 2015. (Doc. 1.)

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff was not disabled under the Act. (Tr. at 24.) The ALJ found at Step One that Plaintiff met the insured status requirements through December 31, 2016 and that he had not engaged in substantial gainful since the alleged onset date, March 22, 2011. (Tr. at 18.). At Step Two, the ALJ concluded that Plaintiff had the following severe impairments: "left upper extremity tear status-post surgery and unstable right shoulder." (*Id*.) At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at

4

19.). The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work. (Tr. at 19-22.) At Step Four, the ALJ found that Plaintiff was able to perform his past relevant work as an insulation worker. (Tr. at 22-23.) The ALJ also found that Plaintiff was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. (Tr. at 23.)

  **E. Administrative Record**

    **1. Medical Evidence**

The medical evidence of record reveals that Plaintiff's right ankle was broken and surgically repaired in 1984. (Tr. at 472.)

Plaintiff underwent right shoulder surgery, because of recurrent dislocation, in 1993. (Tr. at 192-211, 421-40.) Drs. Sprague and Pickering performed an arthroscopic examination, debridement of anterior labrum, bucket handle tear, and anterior capsular repair of Plaintiff's right shoulder. (Tr. at 202.)

In March of 2011, Dr. Sprague performed arthroscopic surgery on Plaintiff's left shoulder, *i.e.*, rotator cuff repair, bicipital tenodesis, and subacrominal decompression with acromioplasty. (Tr. at 236-44, 282-99, 358-66, 497-527, 543-44.) In May 2011, Plaintiff was seen for follow-up care. It was noted that Plaintiff was not taking any medications but that he was experiencing "pain in shoulder, diffusely" but was "[u]nable to describe pain." (Tr. at 528.) it was also noted that Plaintiff reported "he 'twisted' shoulder wrong way and 'heard something move.'" (*Id.*) Upon examination, his upper extremities were "normal, Normal range of motion. Normal inspection shoulder to have, no deformity, no ecchymosis, no swelling, no

hematosis, no erythema, no warmth, no muscle atrophy, distal pulse intact, axillary nerve intact, Active range of motion, causes pain, Tenderness over anterior aspect." (Tr. at 529.) Radiologic images taken of the left shoulder were "[n]ormal." (Tr. at 530.)

In May of 2011, Dr. Sprague recommended and ordered "range of motion exercises for internal rotation and flexion, no abduction." (Tr. at 535.) In August 2011, Dr. Sprague noted that Plaintiff's "[i]nternal rotation is full, external rotation is 30 degrees" but that he will

> always have a permanent disability of no over shoulder level work and no lifting over 20 pounds. This will be permanent. He will never return to work in the capacity he did prior to his injury. Literature states that a male 55 years and under who have had a rotator cuff repair have a poor outcome based on returning to the same function he did prior to surgery. He had a very large tear and he is at risk of re-injuring it. If he has an opportunity for job retraining he needs to take advantage of that opportunity.

(Tr. at 555.) In September 2011, Dr. Sprague noted "a little decreased rotation on the right as compared to the left, but he has good flexion, extension and abduction" and he recommended continued home exercise, using low weights with more repetition rather than heavier weights. (Tr. at 551.) Dr. Sprague also noted that "[h]e will never return to work in the capacity he did before and he is aware of this." (*Id.*)

In November 2011, Dr. Sprague's entire physical examination produced the following statements: "Clinically passively he has good internal and external rotation. He has some impingement signs for flexion and abduction. He has no instability and wounds have healed satisfactorily." (Tr. at 548.) In the next sentence, Dr. Sprague concluded that

> he is approaching MMI. He is permanently and totally disabled as a result of this rotator cuff tear. He had a large rotator cuff tear and bicipital tendon injury. He will never be gainfully employed requiring any above chest level work, any

6

reaching, pushing or pulling. I have discussed this with the patient and he has a realistic outlook. No further treatment required by me.

(*Id.*) The finding, of Plaintiff being unable to work (at his current job) permanently, was memorialized on a form similar to a prescription form. (Tr. at 306.)

In December 2011, an MRI of Plaintiff's left shoulder showed some "thinning of the supraspinatus tendon adjacent to the musculotendinous junction[,]" and "[s]table mild supraspinatus muscle atrophy." (Tr. at 564.)

On May 21, 2012, Dr. Sprague noted that an MRI of Plaintiff's left shoulder showed "some thinning of the rotator cuff" but also showed that the rotator cuff "had healed" since surgery. (Tr. at 303, 335, 561.) Plaintiff reported continued pain but Dr. Sprague's examination showed flexion "is about 110 degrees. Good extension. Abduction is 45 to 50 degrees and there is some restricted internal/external rotation. Neurologically intact." (*Id.*) Dr. Sprague also noted "evidence of bicipital tenodesis." (*Id.*) Dr. Sprague concluded that Plaintiff "will never be able to return to work in the capacity he did before" because the "incidence of re-rupture in this individual is approximately 23%." (*Id.*) Thus, Dr. Sprague "recommended he return to work with restriction and limited use of his upper left extremity. No repeated reaching. No over shoulder work and no lifting more than 5 to 10 pounds below that level." (*Id.*)

In June 2012, Dr. Sprague noted that x-rays of Plaintiff's right shoulder were "[n]ormal" but his "impression is he has unstable right shoulder." (Tr. at 560.) An EMG study done on June 19, 2012, showed "[n]o electrodiagnostic evidence" of carpal tunnel syndrome, cubital tunnel syndrome, cervical radiculopathy or brachial radiculopathy." (Tr. at 567-69.)

Also in June 2012, Plaintiff sought treatment for "problems with his left ear and a lump in the lower part of the sternum." (Tr. at 572.) Plaintiff was given drops for his ear wax and was sent for images and an ultrasound of the lump. (Tr. at 573.) Chest x-rays were normal. (Tr. at 580-81.) An ultrasound of Plaintiff's chest "appears to demonstrate slight mass effect upon the overlying soft tissues. No significant vascular flow is identified with this lesion." (Tr. at 580.) The final impression was that the findings showed what "may be a prominent xiphoid process. No discrete mass is seen." (*Id.*)[1] In August 2012, Dr. Sprague noted that Plaintiff's "wounds have healed satisfactorily. He has 20 degrees of external rotation and internal rotation is midline. Abduction is 70 degrees and flexion is 110 degrees. Neurologically he is intact." (Tr. at 565.) Dr. Sprague noted: "He is at MMI [at maximum medical improvement]. He will have employment restrictions with no lifting over 10 pounds, no repetitive reaching and no overhead activities. I will be happy to reevaluate him in 3 months, but he will have no change in his work restrictions." (Tr. at 565.)

In his Adult Function Report, Plaintiff stated that on a typical day he eats breakfast, does 'general cleaning, care[s] for bird, dog & fish, sometimes shopping, sometimes doctors, sometimes small home maintenance, sometimes make dinner, go to school functions & help my daughter with homework, bath, general cleaning & help care for in-laws with cancer." (Tr. at 160.) Plaintiff has no problem with daily personal care, he cooks his own meals, vacuums, does general cleaning of kitchen and bathroom, mows the lawn and starts laundry. (Tr. at 161.)

---

[1] Xiphoid process is the smallest part of the sternum or the connective tissue associated with that part. See, http://www.dictionary.com/browser/xiphoid-process.

Plaintiff is able to get outside "at least a couple times a day[,]" can walk, drive a car, and can shop for an hour in stores. (Tr. at 162.) Plaintiff watches television a lot, uses his "wave runner" but has to "take it super easy," he hunts but has to warm up beforehand, swims but only does the side stroke now. (Tr. at 163.)

### 2. Administrative Hearing

At the administrative hearing, Plaintiff testified that he is right handed, and that he last worked in March of 2011 as a journeyman insulator. (Tr. at 33.) When asked to describe a typical day, Plaintiff stated, "Well, get up and deal with whatever honey do list there might be at the time. But, sometimes it will be make breakfast. And I might do some reading and watch some TV. And I may try to do things around the house to be helpful, but it's not much as I could do before, obviously." (Tr. at 34-35.) Plaintiff indicated that he cooks and does the dishes "[When I'm yelled at enough. Yes." (Tr. at 35.) Plaintiff is also able to mow the lawn for "[p]robably a half an hour at most" on a standing mower on which "you just squeeze a handle and you turn right or squeeze the other handle and you turn left. So, it's not too much shoulder movement or any for that matter." (Tr. at 35-36.) Plaintiff can go shopping but he has trouble walking sometimes because "[b]oth my knees are bone on bone and right ankle was badly destroyed a long time ago, when I was 18, so that one gives me problems, the left foot has been broken and it gives me problems. So, and also lower back and I have major back problems as, as far as neck and hip area." (Tr. at 36.)

When asked if he could lift a case of 24 cans of soda pop, which weighs approximately eighteen pounds, Plaintiff responded, "Yes. Two hands. That's about it." (Tr. at 37.) When

9

asked if he could unload the dishwasher, Plaintiff said he could in a "more systematic" manner but that he has trouble with numbness in both hands; however, he indicated he could hold things like a glass and that he could turn a doorknob without any problems. (Tr. at 38.) Plaintiff takes non-prescription Tylenol for pain. (Tr. at 39.) Plaintiff had not seen any doctor for around a year prior to the hearing and indicated that although Dr. Sprague had recommended shoulder surgery, Plaintiff "told him, frankly if I can't go to the bathroom by myself using my left arm, I can't give up my right arm." (Tr. at 39-40.) Plaintiff indicated that he does not reach at all with his left arm and when asked whether he could reach with his right, he responded, "Yes. The right shoulder goes in and out of the socket. And if it's something very light, it's not as bad as something heavy…" (Tr. at 40.) Plaintiff stated that he can sometimes sit for an hour and cannot stand very long and that it "depends on temperature mostly." (Tr. at 43.) Plaintiff testified that his "last doctor said the only, only cure for arthritis is move to Florida." (*Id.*)

The ALJ then asked the VE to consider a person with Plaintiff's background who was "limited to ten pounds of lifting; right now I'm not going to put any limits on the standing or walking; only occasional reaching with nondominant upper extremity, that's reaching laterally or forward; no shoulder height or higher reaching; no ladders, ropes or scaffolds; and no unprotected heights." (Tr. at 46.) The VE responded that such a person could perform the following jobs at the sedentary level: protective service worker (1,200 in Michigan, 17,000 nationally); surveillance system monitor (330 in Michigan, 16, 000 nationally). (Tr. at 47.) If a sit/stand at will option were added, the VE responded that the numbers would not change. (Tr. at 47-48.)

**F.      Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the

11

opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must

> be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ

ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;
(ii)  The location, duration, frequency, and intensity of . . . pain;
(iii) Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)   Treatment, other than medication, . . . received for relief of . . . pain;
(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Plaintiff argues that the ALJ erred in the following ways: 1) failed to properly evaluate Plaintiff's RFC in light of his treating doctor's records and opinions; 2) her credibility findings are not supported by substantial evidence; 3) failed to afford appropriate weight to Dr. Sprague's opinions that Plaintiff is unable to use his left upward extremity for work; and 4) failed to provide legitimate reasons for discounting Dr. Sprague's opinion. (Doc. 11.)

#### 1. *The ALJ's RFC findings and Dr. Sprague's Opinions*

The Commissioner is tasked with establishing a claimant's RFC "based on all of the relevant medical and other evidence." 20 C.F.R. § 416.945. However, the Commissioner is not obligated to base this RFC upon a physician's RFC, or upon any particular piece of evidence. "[T]o require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quotation omitted). As in

*Rudd*, the ALJ may find that the claimant can perform light work even where no doctor corroborates that assessment. *Id*. The ALJ was thus not obligated to draft an RFC assessment which comported with one drafted by a physician, and was instead entitled to create an RFC based on his evaluation of the available medical evidence.

Regardless, the ALJ's RFC assessment was consistent with Dr. Sprague's opinion. The RFC limited Plaintiff to "ten pounds of lifting" and "only occasional reaching with nondominant upper extremity, that's reaching laterally or forward; no shoulder height or higher reaching[.]" (Tr. at 46.) Dr. Sprague's most recent assessment of Plaintiff, in August 2012, noted that Plaintiff "will have employment restrictions with no lifting over 10 pounds, no repetitive reaching and no overhead activities" and that these restrictions would not change in the future. (Tr. at 565.) Dr. Sprague also wrote that Plaintiff had "limited use of L upper extremity" (Tr. at 566) but did not state that Plaintiff was unable to perform any work with his left upper extremity as argued by Plaintiff. (Doc. 11 at 9.) I note that, as argued by Defendant, the ALJ may have contributed to this confusion (Doc. 12 at 9; Tr. at 22); however, the only significant question is whether the ALJ's RFC findings match Dr. Sprague's opinion and the two findings are compatible. Dr. Sprague's occasional references to Plaintiff being "disabled" are not entitled to any deference since they are not medical findings but rather address the question ultimately reserved to the Commissioner. *Rudd*; 20 C.F.R. § 404.1527(d)(3). Therefore, I suggest that the ALJ's RFC determination is supported by substantial evidence.

   *2.*   ***The ALJ Properly Supported Her Credibility Findings***

16

In the instant case, the ALJ properly considered all the evidence and the appropriate factors in determining a claimant's credibility. (Tr. at 19-22.) The ALJ also noted that Plaintiff's reported symptoms and limitations could not be reasonably expected to produce his reported pain, symptoms and limitations. The ALJ noted that Plaintiff testified to problems with sitting, standing, and walking yet "nothing in the medical evidence of record indicates the claimant has any back, foot, or knee impairment." (Tr. at 21.)

With respect to the condition that medical evidence does support, I suggest that the ALJ is also correct in finding that the condition could not produce disabling symptoms or limitations. After his March 2011 surgery, Plaintiff's upper extremities were "normal, Normal range of motion. Normal inspection shoulder to have, no deformity, no ecchymosis, no swelling, no hematosis, no erythema, no warmth, no muscle atrophy, distal pulse intact, axillary nerve intact" although movement caused reported pain and tenderness. (Tr. at 529.) Dr. Sprague recommended exercises and advised Plaintiff to seek job retraining. (Tr. at 535, 555.) In November 2011, Dr. Sprague's entire physical examination produced the following statements: "Clinically passively he has good internal and external rotation. He has some impingement signs for flexion and abduction. He has no instability and wounds have healed satisfactorily." (Tr. at 548.) On May 21, 2012, Dr. Sprague noted that an MRI of Plaintiff's left shoulder showed "some thinning of the rotator cuff" but also showed that the rotator cuff "had healed" since surgery. (Tr. at 303, 335, 561.) Plaintiff reported continued pain but Dr. Sprague's examination showed flexion "is about 110 degrees. Good extension. Abduction is 45 to 50 degrees and there is some restricted internal/external rotation. Neurologically intact."

17

(*Id.*) In June 2012, Dr. Sprague noted that x-rays of Plaintiff's right shoulder were "[n]ormal" but his "impression is he has unstable right shoulder." (Tr. at 560.) An EMG study done on June 19, 2012, showed "[n]o electrodiagnostic evidence" of carpal tunnel syndrome, cubital tunnel syndrome, cervical radiculopathy or brachial radiculopathy." (Tr. at 567-69.) Finally, in August 2012, Dr. Sprague noted that Plaintiff's "wounds have healed satisfactorily. He has 20 degrees of external rotation and internal rotation is midline. Abduction is 70 degrees and flexion is 110 degrees. Neurologically he is intact." (Tr. at 565.) Dr. Sprague noted Plaintiff "will have employment restrictions with no lifting over 10 pounds, no repetitive reaching and no overhead activities…. he will have no change in his work restrictions." (Tr. at 565.)

Plaintiff does not take any medication other than Tylenol for pain, and he is not recommended to have any further treatment. (Tr. at 39, 548.) The record simply lacks any evidence of a medical condition that could possibly support Plaintiff's allegations of disabling pain or other symptoms. The ALJ's credibility findings are thus supported by substantial evidence, and should not be disturbed.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Doc. 11) be **DENIED**, the Commissioner's Motion (Doc. 12) be **GRANTED**, and that this case be **AFFIRMED**.

18

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 30, 2016                                S/ Patricia T. Morris
                                                      Patricia T. Morris
                                                      United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 30, 2016                                By s/Kristen Krawczyk
                                                    Case Manager to Magistrate Judge Morris